# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

**Civil Action Number: 1:21-CV-279**

| | |
|---|---|
| D/S NORDEN A/S | )<br>)|
| Plaintiff, | )<br>) |
| v. | ) **VERIFIED COMPLAINT IN**<br>) **ADMIRALTY**<br>) |
| BLUESTONE COAL SALES<br>CORPORATION and<br>BLUESTONE RESOURCES,<br>INC. | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiff, D/S NORDEN A/S (hereinafter "Norden" or "Plaintiff"), by and through undersigned counsel, files this Verified Complaint against Defendants BLUESTONE COAL SALES CORPORATION (hereinafter "BCSC") and BLUESTONE RESOURCES, INC. (hereinafter "BRI") (collectively referred to as "Defendants"), and alleges as follows:

## JURISDICTION AND VENUE

1. Subject matter jurisdiction of this Honorable Court is based upon admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and is brought under the provision of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. This case is also an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for a claim of breach of a maritime contract.

1

2. Venue is proper in this District Court pursuant to 28 U.S.C. §1391(b) because the property belonging to Defendants is located in the Middle District of North Carolina.

## THE PARTIES

3. At all times material hereto, Plaintiff was and still is a foreign company organized under the laws of Denmark.

4. Upon information and belief, at all times material hereto, Defendant Bluestone Coal Sales Corporation was and still is a foreign company organized under the laws of Delaware with its principal place of business in Roanoke, Virginia.

5. Upon information and belief, at all times material hereto, Defendant Bluestone Resources Inc. was and still is a foreign company organized under the laws of Delaware with its principal place of business in Roanoke, Virginia.

## THE FACTS

6. At all times material hereto, Plaintiff was the disponent owner of the M/V PACIFIC MERIT (hereinafter the "Vessel").

7. On or about May 22, 2020, Plaintiff entered into a charter party agreement to charter the Vessel to Defendants for the carriage of cargo consisting of 60,000 MT of coal, 10% more or less in Plaintiff's option. A copy of the fixture recap ("Recap") and charter party ("Charter Party") is attached hereto as Exhibit 1.

8. The charter party agreement for the transport of cargo is a maritime contract.

9. Pursuant to Clause 16 of the Recap and Clauses 19 and 43 of the Charter Party, it is to be governed by English law, and any dispute arising under the agreement shall be referred to arbitration in London.

10. Pursuant to Clause 12 of the Recap and Clause 20 of the Charter Party, Plaintiff and Defendants agreed that demurrage would be calculated at the maximum rate of USD 7,000 (per day pro rata).

11. Pursuant to Clause 7 of the Recap and Clause 31 of the Charter Party, cargo was to be loaded at Norfolk Lamberts Point, Virginia or, in BCSC's option, at Pier VI at the rate of 20,000 MT per weather working day of 24 consecutive hours including, Saturday, Sundays, and holidays.

12. Pursuant to Clause 8 of the Recap and Clause 32 of the Charter Party, cargo was to be discharged in Gdansk, Poland at Port Polnocny Dry Bulk Terminal at the rate of 25,000 MT "per weather working day of 24 consecutive hours, Sundays and holidays included."

13. On June 7, 2020, the Vessel arrived at Norfolk, Virginia ready to discharge and tendered notice of readiness at the port at 12:03 LT. The time for laytime and demurrage calculations began to run at that time.

14. Upon the Vessel's giving of the said notice of readiness, Defendants were not ready to load cargo.

15. The time allowed for loading under the Charter Party was 3.08 days. As Defendants were not ready, the Vessel accrued a total of 11.82 days waiting to load the cargo. A copy of the notice of readiness and the time sheet for the Vessel are attached as Exhibit 2.

16.     Upon completion of the voyage to Gdansk, a total of USD 1,241,108.44 was due to Plaintiff from Defendants, which included lumpsum freight and demurrage for the discharge and loading operations at Norfolk, Virginia.

17.     On or about July 24, 2020, Plaintiff submitted the invoice to Defendants for amounts due and owing for demurrage and freight.

18.     Over the course of July - September 2020, Defendant BRI, on behalf of Defendant BCSC, made partial payments to Plaintiff. On information and belief, all or some of these partial payments related to the Charter Party were remitted by Defendant BRI on behalf of Defendant BCSC from the Defendants' account in BB&T Bank (now Truist Bank) in North Carolina. Taking into account dispatch and broker's commissions, the outstanding balance in favor of Norden constituted USD 98,054.37.

19.     On or about September 18, 2020, Plaintiff re-submitted the invoice to Defendants for amounts due and owing for demurrage and freight, taking into account the above partial payments made by Defendants and other deductions. A copy of the invoice is attached hereto as Exhibit 3.

20.     On or about November 13, the parties entered into a settlement agreement. The agreement was evidenced by an invoice for USD 75,000 issued by Plaintiff to Defendants and containing the following provision:

> This is to confirm that payment of the attached invoice is in full and final settlement of all obligations owed by the parties under that certain agreement dated 13th November 2020, including any amendments, for M/V PACIFIC MERIT - NORDEN/BLUESTONE - C/P 05.22.2020.
>
> *See* Exhibit 4 (the "Settlement Agreement").

4

Case 1:21-cv-00279-TDS-JEP   Document 1   Filed 04/01/21   Page 4 of 19

21. Despite numerous requests for payment of the outstanding balance and their clear obligation to remit unpaid demurrage and freight, Defendants have failed, neglected, or refused to submit payment for the balance of demurrage and freight under the Charter Party or under the Settlement Agreement.

22. On October 28, 2020, Plaintiff's legal counsel sent to Defendants a letter of demand requiring them to pay the outstanding USD 98,054.37 ("Outstanding Sum").

23. On March 3, 2021, after Defendants still had not paid the Outstanding Sum, Plaintiff commenced arbitration against Defendant BCSC under the rules of the London Maritime Arbitrators' Association (LMAA) and appointed an arbitrator (the "Arbitration"). In the Arbitration, Plaintiff seeks to recover the Outstanding Sum, plus interest and legal costs. A copy of the notice of arbitration is attached hereto as Exhibit 5.

## RULE B ALLEGATIONS

24. Plaintiff respectfully submits that all requirements for issuance for an order of attachment pursuant to Supplemental Rule B are readily satisfied here. In that regard, Supplemental Rule B(1)(b) provides, in pertinent part, that "[t]he court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment." Supp. Rule B(1)(b).

25. It is also well established that the relevant conditions of Rule B look to whether: 1) [the plaintiff] has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Vitol,*

*S.A. v. Primerose Shipping Co.,* 708 F.3d 527, 541 (4th Cir. 2013) (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006)).

26. Here, there can be no question that Plaintiff has a valid prima facie admiralty claim against the Defendant BCSC for failure to pay demurrage and freight pursuant to the Charter Party, as such failure constitutes a breach of such Charter Party. Additionally, as set forth in the accompanying Declaration of E. Winslow Taylor, the Defendants cannot be found within this District for purposes of Supplemental Rule B. However, Defendants' property is within this District. Lastly, there is no statutory or maritime law bar to the attachment.

## ALTER EGO ALLEGATIONS

27. In assessing alter ego allegations made in complaints for attachment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), courts in the Fourth Circuit consider the following factors:

> [S]iphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness." … Other factors properly considered by the district court in this case include intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

*Vitol,* 708 F.3d at 544 (4th Cir. 2013) (quoting *Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998) and *Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.*, 622 F. Supp. 2d 46, 53 (S.D.N.Y. 2009)).

28. Defendants BCSC and BRI so blurred the lines between their corporate personalities and their purportedly separate existences that they should be treated as alter ego entities.

29. In addition, Defendants abused the corporate form in order to perpetrate a fraud, injustice, or other wrongdoing, as more fully described herein.

30. Accordingly, any property owned or controlled by Defendant BRI in this District should be considered owned and controlled by Defendant BCSC as its alter ego.

31. The below allegations of fact are based primarily on depositions of several shareholders and officers of companies in the larger Bluestone group (of which Defendants are part), including James C. Justice III, President and shareholder (hereinafter – "Justice III Depo"); Stephen Ball, general counsel, (hereinafter – "Ball Depo"), and James T. Miller, secretary and/or treasurer (hereinafter – "Miller Depo"). These depositions were taken by the US Attorney's Office in connection with contempt of court proceedings brought in 2019 against Justice Energy Company, Inc. ("Justice Energy") for non-payment of a court-ordered sanction in the amount of USD1,230,000.[1] The depositions of Ball, Justice III and Miller are attached as Exhibits 6, 7 and 8, respectively.

32. As a result of these depositions, the US Attorney's Office moved to impose alter ego liability on a number of specifically named Bluestone entities, including BRI, as well as on "other corporations controlled [by] James C. Justice II and James C. Justice III ("the Justices")". The US Attorney's office found that an alter ego relationship existed

---

[1] *James River Equipment Virginia, LLC and United States of America v. Justice Energy Company, Inc.*, Civil Action No. 5:13-cv-28160 (S.D.W. Va.).

between Justice Energy, BRI, other corporations controlled by the Justices, and the Justices themselves. The US Attorney's motion to impose alter ego liability (summarizing the depositions) and its letter to counsel for Justice Energy are attached as Exhibit 9.

**Common ownership, personnel, addresses; control by dominant stockholders; non-functioning of officers**

33. On information and belief, both Defendants have the same shareholders. James C. Justice II ("Justice II") is a resident of West Virginia and owns 60% of the ownership interest in both Defendants. James C. Justice III ("Justice III") is the son of Justice II, a resident of Virginia and the CEO and President of both Defendants. Justice III owns 40% of the ownership interest in both. Both Defendants and the Justices admit as much. *See* Exhibit 10, ¶30.

34. On information and belief, the Justices exercise ultimate control over both Defendants and the larger Bluestone group of companies. [Justice III Depo, p. 10, 15:22; Ball Depo, p. 13, 1:7]. Justice III serves as the president of all companies in the Bluestone group, oversees their operations, and is the ultimate decision-maker for the group [Justice III Depo, p. 13-14, 8:24-1; Ball Depo, p. 17, 2:18].

35. On information and belief, the Bluestone companies (including BRI and BCSC) also share the same lower officers. For example, James T. Miller acts as the treasurer, secretary, or both in all Bluestone entities [Justice III Depo, p. 18, 5:12], including BRI. *See* Exhibit 9, ¶30. As Mr. Miller admits, even though he serves in these positions, he does not have any real involvement in the corporate affairs of the Bluestone companies [Miller Depo, p. 11, 2:5, 11:14].

36. On information and belief, despite being formally registered in Delaware, BRI and BCSC are operated out of a common office space at 302 S. Jefferson Street, Roanoke, Virginia [Ball Depo, p. 22, 8:19; *see also* Exhibits 1, 11]. The Delaware addresses are "care of" the Corporation Trust Company, and no employees or offices of Bluestone are located there.

37. On information and belief, BRI and BCSC, as well as other Bluestone group entities maintain email addresses in the same "@bluestoneindustries.com" domain.

**Failure to observe corporate formalities, intermingling of funds; domination by BRI**

38. On information and belief, BRI is the ultimate corporate parent of other Bluestone companies [Ball's Depo, p. 22, 14:16, p. 39, 9:13; p. 71, 8:19]. BCSC functions as the sales department of the Bluestone group which sells coal mined at facilities controlled by other affiliate companies. [*Id.*, p. 25, 16:24]. All revenues generated by BCSC from the sales are then taken by BRI [*Id.*].

39. On information and belief, BRI's role in the corporate structure controlled by the Justices is to provide administrative, payroll, accounting, and financial services to all other Bluestone entities [*Id.*, p. 22-23, 14:16, 24:3]. For example, BRI paid invoices issued to BCSC by BCSC's creditors. *See* Exhibit 12. In addition, BRI funds shortfalls of other Bluestone entities operating at a deficit, using revenues provided by BCSC [Ball's Depo, p. 26, 1:6].

40. On information and belief, BRI files consolidated tax returns for both itself and other Bluestone companies [*Id.*, p. 24, 12:23]. Also, BRI disburses funds for salaries

9

and other purposes to its subsidiaries in the group from its account with BB&T Bank (now Truist Bank) in North Carolina [*Id.*, p. 25, 2:12]. Further, BRI maintains a group insurance policy which allocates benefits among these subsidiaries based on the quantity of coal produced by each [*Id.*, p. 27, 6:15].

41. On information and belief, Bluestone companies fail to observe corporate formalities and, with rare exception, dispense with shareholder or board of directors' meetings, and take corporate decisions "by agreement" with meetings occurring "on paper" [*Id.*, p. 34-35, 9:3; Justice III Depo, p. 10, 5:14].

42. BRI fully dominates and controls BCSC as the parent company in the Bluestone group. In turn, both Defendants are entirely owned and managed by the Justices. BCSC and BRI fail to observe basic corporate formalities, and their lower officers are nominal and do not participate in corporate affairs. Defendants share common office space and email addresses. The dealings between BCSC and BRI are not at arm's length. In fact, BCSC's funds generated from coal sales are consistently siphoned off to BRI, intermingled, and then disbursed to other Bluestone companies.

43. As a result, Defendants BCSC and BRI so blurred the lines between their purportedly separate existences that they should be treated as alter ego entities. Accordingly, any property owned or controlled by BRI in this District should be considered owned and controlled by BCSC as its alter ego.

**Injustice or fundamental unfairness in the use of corporate form**

44. On information and belief, Defendants made repeated misrepresentations to Plaintiff that Defendants intended to pay the outstanding balance of freight and demurrage due and owing to Plaintiff under the charter party agreement. This includes Defendants' offer to enter into a settlement agreement in the amount of USD75,000. Defendants intentionally engaged in other dilatory tactics to avoid payment to Plaintiff. Defendants never intended to pay or comply with the terms of the settlement.

45. The above constitutes an abuse of the Defendants' corporate form and wrongdoing against Plaintiff, who relied on said misrepresentations and was deterred by Defendants' dilatory tactics from commencing immediate legal or arbitration proceedings against Defendants over the course of several months from September 2020 until March 2021. In the meantime, Plaintiffs' prospects of recovery from Defendants have been seriously jeopardized by Defendants' ailing financial position and the number and amount of other creditors' claims against Defendants' assets.

46. Over the course of September and October 2020, persons acting on behalf of Defendants in connection with the charter party for M/V Pacific Merit made repeated express and implied representations (including by disputing minor discrepancies in the calculations of demurrage) that Defendants intended to pay the outstanding freight and demurrage to Plaintiff.

47. On or about November 13, 2020, persons acting on behalf of Defendants offered Plaintiff to settle the outstanding debt by entering into a settlement agreement for

11

USD 75,000. The settlement was agreed orally, with Defendants making implied representations that they were ready and willing to pay the settlement amount.

48. In fact, persons acting on behalf of Defendants insisted that the settlement include wording releasing all obligations of the parties under the charter party for M/V Pacific Merit in full. Relying on Defendant's representations, Plaintiff agreed to this wording and issued its invoice for USD 75,000, which Defendants never paid. *See* Exhibit 4.

49. It was reasonable for Plaintiff to rely on the settlement agreement and Defendants' implied promises to make payment, since instances of delay in payment of demurrage are common in the industry.

50. Plaintiff did rely on the settlement and Defendants' promises and misrepresentations by deciding not to commence immediate legal or arbitration proceedings against Defendants to swiftly collect the outstanding amounts. Due to Defendants' misrepresentations, Plaintiff was misled into waiting for payment for more than 6 months.

51. By the time Plaintiff commenced the proceedings before this Court, it transpired that the Bluestone group of companies, including BRI and BCSC, became a victim of a large-scale fraud committed by Greensill Investment (UK) Ltd, Bluestone's long-term investment provider. According to Defendants, the fraud resulted in a loss of assets in excess of USD 200,000,000 and caused substantial other damage to Bluestone's business, which is yet to be calculated. *See* Exhibit 10, ¶23.

52. Not until Plaintiff commenced proceedings before this Court did it learn that in May 2020, an ICC arbitral tribunal sitting in Paris ordered Bluestone to pay in excess of USD 10,000,000 to Caroleng Investments Ltd. In fact, in December 2020, Caroleng petitioned to enforce the award against Bluestone's assets in the US.[2]

53. Plaintiff also discovered that on March 3, 2020 another Rule B attachment securing up to USD 1,700,000 was granted by this Court against Defendants' bank account in BB&T Bank (now Truist Bank),[3] which account is the subject of the present proceedings.

54. The above proceedings and litigation affecting Defendants seriously threatens Plaintiff's prospects of recovery from Defendants. According to publicly available information regarding Defendants' financial position, BRI's annual revenue in 2021 is modelled to reach only USD 4,500,000 while BCSC's revenue is estimated to be only USD 34,669. *See* Exhibit 13.

55. As a result, Plaintiff would have been in a much more favorable position to recover the outstanding freight and demurrage from Defendants in the fall of 2020 but did not do so due to Defendants' misrepresentations.

56. By making misrepresentations to Plaintiff as described above, Defendants abused the corporate form, committed a wrongdoing against Plaintiff, and must now be treated as a single entity for the purposes of the requested attachment.

---

[2] *Caroleng Investments Limited v. Bluestone Resources, Inc.*, 1:20-cv-01793 (D. Del.), Dkt 2, 5.
[3] *DH-Dhekelia Ship Management Limited, v. Bluestone Coal Sales Corporation et al*, 1:21-cv-00135 (M.D.N.C).

## APPLICATION FOR ATTACHMENT
## UNDER SUPPLEMENTAL ADMIRALTY RULE B

57. Plaintiff restates and realleges the allegations of paragraphs 1 – 56 above as though fully rewritten herein.

58. Plaintiff's claim against Defendants for unpaid demurrage and freight is a maritime claim. This is an ancillary proceeding to secure jurisdiction and security over Defendants.

59. Interest, costs, and attorney's fees are routinely awarded to the prevailing party under English Law and the procedural rules of London arbitration. It is standard for interest to be awarded to the prevailing party in the amount of 4.5% to 5.5%, compounded quarterly.

60. Plaintiff expects to recover the following amounts in arbitration from Defendant Bluestone:

> A. Demurrage and freight: USD 98,054.37
>
> B. Estimated Interest for Principal Claim: USD 3,238.85
> *(239 days at 5.0% interest compounded quarterly)*
>
> C. Estimated Arbitration Costs, English Solicitor and Counsel Fees: USD 25,000
>
> TOTAL: USD 126,293.22.

61. Plaintiff's total claim for demurrage and freight, plus applicable interest, costs, and fees in the aggregate is estimated to be no less than USD 126,293.22 (the "Claimed Amount").

62. Defendants are not present and cannot be found in the District within the meaning of Rule B. *See* Attorney Declaration of E. Winslow Taylor attached hereto as Exhibit 14.

63. Upon information and belief, Defendants do have within the District tangible or intangible personal property which is subject to attachment and in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment. Specifically, Defendants have assets in the form of property in a bank account maintained at BB&T Bank (now Truist Bank). A copy of a SWIFT message containing Defendants' bank account information is attached as Exhibit 12.

64. BB&T Bank (now known as Truist Bank) is a corporation found within the District with an address at 7701 Airport Center Drive, Suite 2700, Greensboro NC 27409 and subject to service of process as a garnishee in this matter.[4]

65. Prior payments by Defendants to Plaintiff have been remitted by BRI from its BB&T Bank (now Truist Bank) U.S. dollar bank account located within the District. *Id*.

**WHEREFORE**, Plaintiff prays as follows:

1. That the Clerk of Court issue Process of Maritime Attachment and Garnishment pursuant to Rule B, as prayed for in the Verified Complaint, against all bank accounts, checks, payments made to, held or which may be receivable by, the garnishees on behalf of Defendants, monies, disbursement advances, goods or other services,

---

[4] Due to the recent stay-at-home order, this branch location may be temporarily closed, operating with limited hours, or may limit the public access. Accordingly, Plaintiff respectfully request that it be ordered that service of process on garnishee may be attempted at any BB&T (now Truist) branch that is open and will accept service of process.

documents of title, shares of stock or other financial instruments and any other funds, collateral or property of any kind belonging to, claimed by, or held for the benefit of Defendants within this District in an amount up to USD 126,293.22 pursuant to Supplemental Rule B, and the same be attached as may be found in the possession, custody, or control of the garnishee(s) or which are found in the possession or control of specific garnishee Truist Bank (formerly BB&T Bank) and said Order being equally applicable with respect to the issuance and service of additional Writs of Maritime Attachment and Garnishment upon any garnishee in this district not named therein; and

    2.    That all persons claiming any interest in the property attached or garnished pursuant said Order, upon application to the Court, be entitled to a prompt hearing in which the Plaintiff shall be required to show why the attachment should not be vacated or further relief granted; and

    3.    That supplemental process enforcing this Order may be issued by the Clerk upon application without further order of the Court; and

    4.    That a copy of this Order be attached to an served with the Writ of Maritime Attachment and Garnishment; and

    5.    That pursuant to Rule B(1)(b)(ii) E. Winslow Taylor, of Taylor & Taylor Attorneys at Law, PLLC, counsel for Plaintiff is specially appointed to make service of the Writ of Maritime Attachment or Garnishment, along with a copy of the Verified Complaint and other ancillary documents in this action. Mr. Taylor may further appoint or engage any other person at least 18 years of age and not a party to this action to make service of process in this action without further order from the Court; and

6. That following the initial service by the United States Marshal or other duly-designated process server upon the garnishee, supplemental service of Writ of Maritime Attachment or Garnishment, as well as this Order, may be made by e-mail of facsimile transmission to the garnishee; and

7. That Pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), the garnishee may consent, in writing, to accept service by any other means; and

8. That any tangible or intangible property in the hands of the garnishee(s) and attached pursuant to this Order may be released from seizure without the necessity of further orders of this Court, provided that the Marshal or garnishee(s) receives written authorization to do so from the attorney who requested the attachment and garnishment stating that he has conferred with all attorneys representing parties to the litigation and they consent to the request for the release, and also provided that the Court has not entered any subsequent orders modifying this arrangement for the release of the property which was attached pursuant to this Order; and

9. That service of the garnishee as described above is deemed continuous throughout the day from the time such service through the opening of the garnishee's business on the next business day.

10. Service on any garnishee, as described above, is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day.

Dated: April 1, 2021

                                  Respectfully submitted,

                                  By:

/s/ Luke F. Zadkovich
Luke F. Zadkovich
Edward W. Floyd
Eva-Maria Mayer
**Zeiler Floyd Zadkovich (US) LLP**
luke.zadkovich@zeilerfloydzad.com
ed.floyd@zeilerfloydzad.com
Telephone: (917) 999 6914
215 Park Ave South, 11th Floor
New York, New York 10003
**PRO HAC VICE ATTORNEYS FOR PLAINTIFF** (to be filed)

/s/ E. Winslow Taylor
E. Winslow Taylor
Daniel R. Taylor Jr.
Taylor & Taylor Attorneys at Law PLLC
NC Bar #: 45533
418 N. Marshall St., Suite 204
Winston-Salem, NC  27101
Tel.:  336-418-4745
Email: Winslow@t2legal.com
**LOCAL ATTORNEY FOR PLAINTIFF**

# VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Luke Francis Zadkovich, declare and state under penalty of perjury that the foregoing is true and correct:

1. I have read the foregoing Verified Complaint and know the contents therefore and that the same are true to my knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

2. The source of my information is documents, records, and other information supplied by the Plaintiff and/or its representatives related to this matter, and the Defendants herein, which I have reviewed.

3. This verification is made by me because Plaintiff is a foreign corporation with its principal place of business in a foreign country.

4. I am an attorney representing D/S Norden A/S., the Plaintiff in this matter, and am authorized to sign this Verification.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2021

By: _____
Luke F. Zadkovich
Partner, Zeiler Floyd Zadkovich