**EXHIBIT 10**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ─────────────────────────── x | |
| BLUESTONE RESOURCES, INC., | Civil Action No. |
| BLUESTONE COAL SALES CORPORATION, | |
| BLACKSTONE ENERGY, LTD., | Complaint |
| JAMES C. JUSTICE II, | |
| CATHY L. JUSTICE, AND | |
| JAMES C. JUSTICE III | |

*Plaintiffs.*

v.

GREENSILL CAPITAL (UK) LIMITED,
LEX GREENSILL,
ROLAND HARTLEY-URQUHART

*Defendants.*

## <u>COMPLAINT</u>

Plaintiffs Bluestone Resources, Inc., Bluestone Coal Sales Corporation,

Blackstone Energy, Ltd., James C. Justice II, Cathy L. Justice, and James C. Justice III (each a

"<u>Plaintiff</u>," and collectively two or more, "<u>Plaintiffs</u>") file this civil action under New York,

Delaware and West Virginia state and common law for direct, consequential and punitive

damages, costs of suit, and such other relief as may be just and proper against Defendants

Greensill Capital (UK) Limited ("<u>Greensill Capital</u>"), Lex Greensill ("<u>Mr. Greensill</u>") and

Roland Hartley-Urquhart ("<u>Mr. Hartley-Urquhart</u>" and together with Greensill Capital and Mr.

Greensill, each a "<u>Defendant,</u>" and collectively two or more, the "<u>Defendants</u>") for, among other

things, breach of contract, breach of the covenant of good faith and fair dealing, fraud, breach of

fiduciary duties, aiding and abetting breaches of fiduciary duties and civil conspiracy all in

connection with the Defendants' unlawful and intentional scheme against Plaintiffs arising out of and relating to a contractual relationship pursuant to which, prior to its collapse in March 2021, Greensill Capital provided comprehensive enterprise financing (as described in more detail below, the "Enterprise Financing") to Bluestone Resources, Inc., Bluestone Coal Sales Corporation, and Blackstone Energy, Ltd. (respectively, "Bluestone Resources," "Bluestone Coal Sales," and "Blackstone Energy," and collectively with their affiliates engaged in mining or related businesses, "Bluestone").

Based upon personal knowledge, information, and belief, Plaintiffs specifically allege:

## INTRODUCTION

1. Throughout Plaintiffs' business relationship with Defendants, which Defendants initiated on or around May 2018, Defendants perpetrated a continuous and profitable fraud on Plaintiffs under the guise of establishing a long-term financing arrangement with Bluestone. Over the course of that period, Defendant Greensill Capital advanced $850 million to Bluestone, of which approximately $108 million was paid directly in cash back to Greensill Capital in the form of fees and Greensill Capital received at least another $100 million in prospect equity value through warrants. Greensill Capital was only able to perpetrate its fraud on Plaintiffs by inducing Plaintiffs to believe that they had found a long-term financing partner to support Plaintiffs' efforts to rehabilitate and relaunch their newly acquired Bluestone business – a business that had been severely neglected and mismanaged under prior ownership. At every point during their relationship with Plaintiffs, Defendants acknowledged and agreed that the Enterprise Financing was intended to be a long-term financing partnership and in so doing induced Plaintiffs to increase their exposure to and dependency on Greensill Capital, resulting in greater and greater financial benefit to Defendants. Bluestone meanwhile performed their

obligations as required at all times, making all payments to Greensill Capital as and when due and responding to requests from Greensill Capital with respect to new opportunities, to further foster the critical financing relationship that would allow Bluestone to rebuild and grow its businesses.  Notwithstanding Plaintiffs' consistent good faith, throughout this time, Defendants continuously deceived Plaintiffs.  Defendants used their business relationship with Bluestone to prime the pump for Defendants' larger fraudulent activities, which Plaintiffs now learn spanned multiple countries and led to the collapse of Greensill Capital and the ouster of its leaders Lex Greensill and Roland Hartley-Urquhart.  Greensill Capital's sudden and unjustified abandonment of Bluestone, together with all of the press surrounding Greensill Capital's fall, now present a clear and present threat to Bluestone's business.  Defendants are responsible for all damages to Plaintiffs caused as a result of their egregious actions.

2.      Bluestone is engaged in the business of mining and processing high quality metallurgical ("met") coal primarily in the state of West Virginia for use in the production of steel, as well as production of met coke, a refined product derived from met coal, in Alabama.  Bluestone's customers are some of the largest steel producers in the world. Bluestone sells its met coal and met coke into interstate and international commerce, with international shipping taking place primarily from the ports of Norfolk and Newport News, Virginia.

3.      Prior to 2009, the Bluestone assets were owned by Bluestone Industries, Inc., Dynamic Energy, Inc. and JCJ Coal Group, LLC.  In 2009, Mechel Bluestone, Inc. and Mechel Mining OAO (together, "Mechel") purchased the equity of these three entities (the "Mechel Purchased Assets").  Mechel operated the Mechel Purchased Assets for approximately six years through 2015, when it offered the assets for sale.  In 2015, the Justice family formed

-3-

Bluestone Resources to acquire the stock of Mechel Bluestone, Inc.  At the time of the 2015 acquisition, the business was in financial and operational peril.  The business had been mismanaged under Mechel ownership, burdening it with substantial reclamation, union and trade obligations.  Bluestone Resources, as acquirer, took on a business that, under Mechel's ownership, had failed to make even the most basic required investments in mine operations and mine safety infrastructure, with the goal of returning Bluestone to profitability.

4.      Following the 2015 reacquisition of the Mechel Purchased Assets, the owners and management of the reconstituted Bluestone developed and began to implement a long-term plan to rehabilitate and rebuild the business.  That plan included the implementation of long-delayed investment in production capacity and related infrastructure as well as strategic acquisitions.  As part of this strategy, in 2019, Bluestone acquired a coke plant in Birmingham, Alabama and the West Virginia met coal assets of Pinnacle Mining Co. LLC.

5.      In May 2018, as Bluestone was in the midst of creating their reinvestment and expansion strategy, Bluestone was approached by Mr. Hartley-Urquhart, Greensill Capital's Vice-Chairman, through a mutual business acquaintance.  Since that first introduction, Plaintiffs' main contact with Greensill Capital has been Mr. Hartley-Urquhart.  From mid-2018 through February 2021, on average, James C. Justice III ("JCJ III") spoke on the phone or in person with Mr. Hartley-Urquhart weekly and regularly exchanged email communications, with the frequency of email communications increasing over time through 2020 and into early 2021.  Throughout all of Plaintiffs' dealings with Greensill Capital, Mr. Hartley-Urquhart represented that he spoke for and had authority to bind Greensill Capital.  Mr. Hartley-Urquhart further represented that he was in constant contact with Mr. Greensill, Greensill Capital's Chairman, that Mr. Greensill was fully aware of Mr. Hartley-Urquhart's discussions with and agreements with

Bluestone and that Mr. Greensill was fully engaged in the business relationship.  Furthermore, Mr. Greensill visited the Plaintiffs in April 2019 in West Virginia to discuss the Bluestone business.

6.     In the initial 2018 discussions, Greensill Capital and Mr. Hartley-Urquhart, with the support and approval of Mr. Greensill, described to Plaintiffs substantial financing opportunities that included in the first instance supply chain financing and receivables financing.  Following the 2018 initial discussions and based on the assurances and representations of Greensill Capital (and of Mr. Hartley-Urquhart, in particular), Bluestone and Greensill Capital agreed to enter into a supply-chain financing program (the "SCF Program") and a receivables purchase program (the "RPA Program").  These programs eventually became the cornerstones of the relationship between Plaintiffs and Defendants and were supplemented over time by multiple oral and written undertakings that collectively constitute the Enterprise Financing.

7.     From the start, Plaintiffs and Greensill Capital both agreed and understood that the Enterprise Financing constituted a long-term financing agreement pursuant to which the Plaintiffs and Greensill Capital would partner in the long-term growth and success of the Bluestone business, supported by a relationship of mutual trust.  The Enterprise Financing was premised on Greensill Capital's agreement to finance a comprehensive rebuilding of the Bluestone business, that such rebuilding would require significant time to develop and bear fruit, and that Defendants' agreement to increase and continue funding under the Enterprise Financing was predicated on Defendants' agreement that Bluestone would repay Greensill Capital through the eventual fruit borne from the rebuild—including cash generated from increased profitability, a potential IPO or a potential sale of the business.

8.      The Enterprise Financing was memorialized in a series of documents and oral agreements, including, without limitation, the Customer Agreement, dated June 14, 2018 ("CA" and together with related documents, the "SCF Program Documentation") and the Receivables Purchase Agreement, dated September 26, 2018 (the "RPA" and together with related documents, the "RPA Program Documentation" and together with the SCF Program Documentation, the "Program Documentation").  As of the date of this Complaint, approximately $780 million has been advanced under the RPA Program and approximately $70 million has been advanced under the SCF Program.

9.      The SCF Program established a supply chain financing facility line of credit for Bluestone to draw on to pay down its accounts payable as an additional source of liquidity.

10.      The RPA Program contemplates the purchase by Greensill Capital from Bluestone of "prospective receivables" – receivables that have not yet been generated by Bluestone – from a list of "prospective buyers" – a list that included both existing customers of Bluestone and other entities that were not and might not ever become customers of Bluestone (the "Prospective Receivables").  This structure is expressly contemplated by the language of the RPA Program Documentation from its creation in 2018:  the defined term "Receivables" includes so-called "prospective receivables" and the RPA identifies "prospective buyers" as "Account Debtors." This list of Account Debtors was created by Defendants by providing Bluestone with a list of potential buyers and asking Plaintiffs to identify those buyers Plaintiffs believed could potentially be buyers of Bluestone's met coal in the future.  Defendants also determined in their discretion (i) the amount of each Prospective Receivables purchase and the credit amount of each Account Debtor, (ii) the "maturity date" of each Prospective Receivable

-6-

(i.e., the nominal date that Bluestone would have to "repay," or roll over the obligation to Greensill Capital), and (iii) additional terms relating to each Prospective Receivable purchase under the RPA.  By structuring the RPA Program to be based predominantly on Prospective Receivables within the defined term "Receivables," Greensill Capital – from the start – agreed to finance Bluestone based not on the existence and collectability of Bluestone's then-existing receivables, but rather based on Bluestone's long-term business prospects.

11.     From the inception of the RPA Program, as amounts purportedly came "due" under the RPA Program Documentation, Greensill Capital would "roll" amounts owed by Bluestone.  The "rolling" of such amounts was part and parcel of the RPA Program from the beginning, offered by Defendants and affirmed throughout the parties' relationship by consistent correspondence.  By way of example, on January 4th, 2019, $15 million of Prospective Receivables were scheduled to "mature" or be rolled over.  On that day, Greensill Capital was to "purchase" new Prospective Receivables in the amount of $15 million from Bluestone by wiring to Bluestone a discounted amount of $14,543,186 (with the "discount" corresponding to the interest to be paid from the date of the new purchase until the next roll date).  Bluestone then wired to Greensill Capital the $14,543,186 just received from Greensill Capital *plus* the difference between such amount and the $15 million to be repaid ($456,814 in this instance) back to Greensill Capital.  The net result of that exchange was Bluestone's payment to Greensill Capital of only the $456,814 in interest.

12.     On or about July 30, 2020, Greensill Capital unilaterally offered to modify the parties' course of dealing, with Mr. Hartley-Urquhart informing Bluestone that it would no longer be asked "roll" the entire amount "due" to Greensill Capital, but rather only pay to Greensill Capital the net payment, attributable to interest paid to Greensill Capital (i.e., in the

example above, the $456,814).  Greensill Capital described this process as a "cashless roll," making clear that any obligations to repay amounts advanced under the SCF and RPA Programs were long-term financing, confirming the long-term nature of the Enterprise Financing, The "cashless roll" became the accepted means of paying interest through the duration of the Enterprise Financing relationship.  In line with that understanding, Defendants repeatedly acknowledged that Bluestone would not be required to begin to repay amounts extended as part of the Enterprise Financing under the SCF and RPA Program Documentation until 2023 at the earliest.

13.     Defendants understood clearly throughout that the Bluestone business was not expected to generate sufficient cash flow in the near term to pay down the amounts advanced under the SCF and RPA Programs.  As a result, the parties agreed that amounts owed under the SCF and RPA Programs would remain outstanding until such time that the business could generate sufficient cash flow to begin to amortize the debt.  That understanding was affirmed consistently by Defendants, including through the first 8 months of the COVID pandemic (March to November 2020), during which time Bluestone, like many companies, required additional liquidity and sought assistance from its financing partners.  Prior to the COVID pandemic, Defendants had initially committed to a 4-5 year financing period, but in March 2020 as the pandemic hit, Defendants further extended that financing commitment to a 6-8 year period and induced Plaintiffs to continue to expand their exposure to and deepen its dependency on Greensill Capital.  As confirmation of that agreement, Defendants also offered to increase the availability of funds to Bluestone in exchange for additional fees.

14.     Following the implementation of the "cashless roll" mechanism, Defendants continued to agree, including through frequent phone calls between JCJ III and Mr.

-8-

Hartley-Urquhart, to extend additional capital and to commit to the long-term financing that Plaintiffs sought and believed they had found.  That understanding was also reaffirmed in discussions throughout 2020 with respect to potential plans for Greensill Capital to convert some or all of its debt into Bluestone equity.  To that end, Greensill Capital entered into (i) that certain Warrant Agreement, dated December 12, 2018, pursuant to which Greensill Capital obtained warrants that could be exercised to purchase at negligible cost 2.5% of the ownership interest of Bluestone Resources (the "First Warrant Agreement"), which was terminated and cancelled in connection with the entry into the Second Warrant Agreement, and (ii) that certain Warrant Agreement, dated June 10, 2019, pursuant to which Greensill Capital obtained warrants that can be exercised to purchase at negligible cost 10% of the ownership interest of Bluestone Resources (the "Second Warrant Agreement").

15.      Throughout the Enterprise Financing relationship, Bluestone paid Greensill Capital, in addition to interest on funds advanced, substantial fees, becoming on information and belief one of Greensill Capital's largest revenue generators.  These fees totaled in excess of $108 million; Greensill Capital lent Bluestone all of the funds necessary to pay such fees.  These fees were a key component of the Enterprise Financing relationship and were memorialized in a total of no fewer than 16 fee and fee side letters dated between June 14, 2018 and November 30, 2020.  Included in those fees, in connection with the entry into the Second Warrant Agreement, on June 10, 2019, Bluestone paid Greensill Capital a $25 million fee in connection with the cancellation of the warrant under the First Warrant Agreement.  Without justification, Greensill Capital made the cancellation of the warrant under the First Warrant Agreement, the payment of the $25 million warrant cancellation fee and the issuance of the warrant under the Second Warrant Agreement conditions to Greensill Capital's willingness to

provide additional capital to Bluestone.  All amounts "paid" to Greensill Capital by Bluestone were from funds borrowed by Bluestone from Greensill Capital. Greensill Capital advanced $850 million to Bluestone, of which $108 million was directly paid back to Greensill Capital in cash in the form of fees.[1]  In addition to the $108 million in fees, Greensill Capital received warrants to purchase ownership interests in Bluestone at negligible cost worth at least another $100 million – raising the total value of the fees and warrants received to $208 million. Taking the total value received by Greensill Capital ($108 million fees, warrants with a value of at least $100 million and approximately $89 million interest) into account, the return to Greensill Capital is consistent with a long-term financing commitment to a business like Bluestone, not a short-term liquidity facility.

16.     In September 2020, JCJ III met with Mr. Hartley-Urquhart at his home in Westhampton, New York to discuss the ongoing, long-term partnership between Greensill Capital and Bluestone.  During that meeting, Mr. Hartley-Urquhart assured JCJ III that Greensill Capital would continue to fund Bluestone throughout the turbulent COVID-19 pandemic and work with Bluestone to improve production and sales.  Mr. Hartley-Urquhart assured JCJ III that Greensill Capital would continue to "roll" and extend maturities until Bluestone was well-positioned to begin a gradual repayment.   Consistent with their long-standing partnership, Mr. Hartley-Urquhart promised to not leave Plaintiffs "holding the bag" because he believed in the Bluestone business as an asset and believed in the strength of Bluestone's management.

17.     Nevertheless, in November 2020, Defendants began to change the tone and substance of their communications with the Plaintiffs.  Apparently as Greensill's own as yet

---

[1] Bluestone ultimately only received $723 million in cash from the arrangement.  The $127 million difference between the $850 million advanced and the $723 million is attributable to $108 million in fees and $19 million in initial discounts.

-10-

undisclosed financial crisis mounted, Defendants embarked on a further scheme to extract additional value from Bluestone, demanding additional fees, demanding the creation of new security interests for the benefit of Greensill Capital to secure the repayment of already existing borrowings, and demanding accelerated repayment of amounts outstanding under the Financing Programs beginning as early as July 2021.  These statements were made despite the representations made by Defendants prior to that date, including by Mr. Hartley-Urquhart just two months prior to JCJ III.  Although concerned with the new requests and the about-face on the timing of repayment, Bluestone had no choice but to agree to enter into the Guarantee and Security Agreement, dated November 3, 2020, pledging collateral to Greensill Capital (the "Guarantee and Security Agreement").  Greensill Capital provided no new consideration for the granting of such security interests.  Bluestone also agreed to pay Greensill Capital a $15 million fee, also without any new consideration from Greensill Capital.

18.     During this period, Greensill Capital represented to Plaintiffs its intention to facilitate a debt to equity conversion of some of the amounts owed to Greensill Capital.  To this end, Mr. Hartley-Urquhart introduced Plaintiffs to Mr. Randolph Habeck, a new member of the Greensill Capital team, touting Mr. Habeck as the person who would lead that effort. Plaintiffs were very interested in a debt to equity conversion. The Defendants were well aware of the risks of forcing the Plaintiffs into engaging in a high yield debt refinancing, which was actually Mr. Habeck's specialty.  This bait and switch was indicative of Greensill Capital's deceptive conduct during the period leading up to its collapse.

19.     Only later through press reports and information released as part of Greensill Capital's UK and Australian administration proceedings did Plaintiffs come to understand that these changes in Greensill Capital's treatment of Bluestone came at a time when

Greensill Capital was facing challenges from its insurance underwriter, was having trouble finding a new auditor, had realized that there was no chance for the launch of an IPO, fielding questions from its financiers at the Credit Suisse group and beginning consideration of a possible bankruptcy while German banking regulators were completing a forensic audit of Greensill Capital's German bank subsidiary that has now resulted in an investigation of criminal fraud. Had Plaintiffs understood that Greensill Capital was under serious financial stress and on the brink of collapse, Plaintiffs would not have agreed to such value transfers and would have immediately sought alternative financing. At that time, Plaintiffs continued to believe – as Defendants over and over induced them to – that Greensill Capital remained a stable and committed financing partner for the long-term.

20.     Attempts to obtain clarification from Greensill Capital on these changes were met with obstruction and obfuscation from Mr. Hartley-Urquhart. In the lead up to, and amidst Greensill Capital's financial collapse, Defendants engaged in a pattern of material misrepresentations to Plaintiffs with respect to, among other things, Greensill Capital's ability to perform under the Financing Programs and the Enterprise Financing and Greensill Capital's own increasingly perilous financial condition. Knowing full well that Plaintiffs were dependent on Greensill Capital for financing, Defendants used their position of trust and confidence to extract unjustified concessions from Plaintiffs. At the same time, Plaintiffs relied on those representations in continuing to depend on Greensill Capital as the reliable long-term financing partner that Defendants consistently claimed it to be.

21.     Over the course of January and February 2021, Defendants, including Defendant Mr. Hartley-Urquhart personally, continued to pressure Plaintiffs with respect to accelerating the repayment of debt in 2021, engaging in increasingly frantic conduct, including

-12-

urging Bluestone to engage a financial advisor of Mr. Hartley-Urquhart's choosing to negotiate a potential refinancing transaction.

22.     Never once prior to reading press reports in early 2021 did Plaintiffs have any understanding as to how Greensill Capital financed or operated its own business.  Plaintiffs were unaware how Greensill Capital packaged obligations from its own borrowers and somehow transferred certain of those obligations to third parties.  Plaintiffs were also unaware of any involvement of Greensill Capital's affiliated German bank in the financing of Greensill Capital or of any aspect of the Enterprise Financing.  Even today, Plaintiffs have received no documentation from Greensill Capital indicating whether and to what extent any part of the Enterprise Financing or obligations thereunder have been transferred from Greensill Capital to any other entity.

23.     Around February 9, 2021, Plaintiffs learned for the first time of Greensill Capital's purported obligations to funds managed by the Swiss bank group Credit Suisse relating to Bluestone's supply chain financing or receivables.  A few days after Bluestone paid Greensill Capital interest in connection with a "cashless roll," Defendant Mr. Hartley-Urquhart urgently demanded Bluestone make an additional payment – this time to funds managed by Credit Suisse.  Mr. Hartley-Urquhart explained to JCJ III that Greensill Capital itself had failed to make its own required payment to such Credit Suisse funds and attempted to pressure Bluestone into covering such unpaid Greensill Capital obligation.  JCJ III refused, stating that he had no idea of Credit Suisse's involvement or how any transaction between Bluestone and Greensill Capital implicated Credit Suisse.  Later that night, Mr. Hartley-Urquhart emailed JCJ III to say that he found a solution to Defendants' Credit Suisse issue.  At the time and as of the date of this Complaint, Plaintiffs are unaware what that "solution" was.  Defendants' misrepresentations and fraudulent

-13-

and deceptive conduct in connection with the Enterprise Financing, including in the lead up to Greensill Capital's financial collapse in March 2021, caused material harm to Plaintiffs. Plaintiffs were deceived into transferring material value to Defendants in reliance on misrepresentations made by Defendants, including those made by Defendants at the time they knew Greensill was on the brink of collapse. Unbeknownst to Plaintiffs, Defendants' efforts were not designed to expand a long-standing lending relationship, but rather to inflate Greensill Capital's own income and valuation for investors and lenders. Defendants then leveraged their position of trust with Plaintiffs to defraud Plaintiffs in an effort to delay or avoid Defendant Greensill Capital's own collapse. In addition to defrauding Bluestone into the transfer of over $200 million of value, Defendants have caused Plaintiffs significant reputational harm. As a result of press reports of Bluestone's relationship with the tarnished name of Greensill Capital has caused substantial damage to Bluestone's business, which damage is not yet able to be calculated.

24.     In addition, throughout the relationship between the parties, Defendants engaged in conduct that exceeded the traditional role of a lender, and exerted control over Bluestone. Defendants sought to control Bluestone's operations to their own benefit in order to arrange for an exit from Defendant Greensill Capital's position through a sale of Bluestone to a buyer of Defendants' choosing. In furtherance of this scheme, in January 2020, Defendants introduced Plaintiffs to GFG Alliance ("GFG"). GFG is a collection of global businesses and investments, owned by Sanjeev Gupta and his family. The GFG Alliance is structured into three core businesses: aluminum, energy, and—most relevant to the relationship with Bluestone— steel. At the time, Bluestone was not familiar with GFG, but from Greensill Capital came to understand that GFG was also an important client of Greensill Capital's, though Bluestone had

-14-

no knowledge as to the extent or pervasive nature of the relationship between GFG and the Defendants.

25.     After Defendants introduced Plaintiffs to GFG, Plaintiffs were emphatically encouraged by the Defendants into a customer relationship with GFG, delivering met coal to the Defendants' recommended business partner.  Bluestone sold their first delivery of met coal to GFG in June 2020 and for which GFG was granted an extended payment period to December 2020, for which GFG still late in payment.   Bluestone sold a second round of cargo in December 2020, to ship in January 2021—Bluestone ultimately withheld the shipment due to concerns regarding the credit risk of GFG.  Following GFG's failure to make payment to Bluestone when due in December 2020, Defendant Mr. Hartley-Urquhart at first vouched for GFG and urged Plaintiffs to continue to do business with GFG despite the late-payment, but later agreed that if he were in Bluestone's shoes, he would not ship to GFG.

26.     Furthermore, amidst Defendants' campaign to defraud Plaintiffs in late 2020 and early 2021, Defendants sought to control and interfere with Bluestone's selection of a financial advisor in connection with the parties' financing discussions.  When Mr. Hartley-Urquhart learned that Bluestone was considering hiring certain investment banks, Mr. Hartley-Urquhart reached out to those banks (despite Bluestone's insistence to the contrary) and sought to dictate Bluestone's selection, indicating he wanted Plaintiffs to only utilize an investment bank hand-picked by him.  Particularly, Mr. Hartley-Urquhart emphatically pushed Bluestone to choose either Rothschild or Morgan Stanley (the former employer of both Mr. Hartley-Urquhart and Mr. Greensill).  Upon hearing that Bluestone hired different advisors, Mr. Hartley-Urquhart became increasingly frantic and upset.  Defendants' conduct went beyond the traditional lender-

borrower relationship and imposed duties on Defendants with respect to Bluestone, duties which Defendants breached as part of its fraudulent scheme.

27.     Defendants' misconduct was inherently self-concealing. After reasonable discovery, Plaintiffs will uncover more evidence to support the allegations contained herein.

## THE PARTIES

28.     Plaintiff Bluestone Resources is a Delaware corporation and is a party to the CA.  Bluestone Resource's headquarters is in Roanoke, Virginia and its principal place of business is West Virginia.  It also maintains operations in Alabama.

29.     Plaintiff Bluestone Coal Sales is a Delaware corporation and is a Seller under the RPA.  Bluestone Coal Sale's principal place of business is West Virginia.

30.     Plaintiff Blackstone Energy is a Virginia corporation and a Seller under the RPA.  Blackstone Energy's principal place of business is Virginia.

31.     Plaintiff James C. Justice II ("JCJ II") is a resident of West Virginia, and owns 60% of the ownership interest in the Bluestone Plaintiffs.  Plaintiff Cathy L. Justice is a resident of West Virginia.  Plaintiff JCJ III is a resident of Virginia, and is the CEO and President of each of the Bluestone Plaintiffs and owns 40% of the ownership interest in the Bluestone Plaintiffs.

32.     Defendant Greensill Capital is organized under the laws of England and is a party to the CA and the RPA as Buyer.  Greensill Capital's principal place of business is the United Kingdom.

33.     Defendant Lex Greensill is the co-founder and former CEO of Greensill Capital (UK) Limited.  On information and belief, Mr. Greensill is a resident of the United Kingdom.

-16-

34.     Defendant Roland Hartley-Urquhart is the former Vice Chairman of Greensill Capital (UK) Limited.  On information and belief, Mr. Hartley-Urquhart is a resident of the State of Florida.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

36.     This Court has jurisdiction over Plaintiffs' related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

37.     The parties have agreed to venue in this Court pursuant to the terms of the RPA and the CA.

## FACTUAL ALLEGATIONS

***Background of Bluestone Business***

38.     Bluestone is engaged in the business of mining and processing high quality met coal principally in the state of West Virginia for use in the production of steel.

39.     Bluestone's customers are some of the largest steel producers in the world.

40.     Bluestone sells their met coal into interstate and international commerce, with international shipping taking place primarily from the ports of Norfolk and Newport News, Virginia.

41.     Plaintiffs Bluestone Resources and Bluestone Coal Sales are privately held Delaware corporations and Plaintiff Blackstone Energy is a privately held Virginia corporation controlled by members of the Justice family of West Virginia (the "Justice Family").

42.     Prior to 2009, the Bluestone assets were controlled by the Justice Family through their affiliations with three entities:  Bluestone Industries, Inc., Dynamic Energy, Inc. and JCJ Coal Group, LLC.

43.     In 2009, Mechel Bluestone, Inc. and Mechel Mining OAO purchased those three entities and control of the Bluestone assets.  Mechel operated the Mechel Purchased Assets through 2015, when Bluestone Resources, Inc., an entity formed by the Justice family, purchased the Bluestone assets by purchasing the stock of Mechel Bluestone, Inc.

44.     Following the 2015 reacquisition of the Mechel Purchased Assets, the owners and management of the reconstituted Bluestone developed and began to implement a long-term growth plan.  This plan included the implementation of delayed investments in production capacity and related infrastructure as well as strategic acquisitions.  As part of this strategy, in 2019, Bluestone acquired a coke plant in Birmingham, Alabama and the West Virginia met coal assets of Pinnacle Mining Co. LLC.

***Plaintiffs Introduced to Defendants in 2018 and Parties Form the Financing Partnership***

45.     Plaintiffs were first introduced to the Defendants in May 2018 through a meeting at Plaintiffs' property in White Sulphur Springs, West Virginia which was attended by Mr. Hartley-Urquhart, JCJ III and JCJ II.

46.     Plaintiffs' main contact with Greensill Capital has always been Mr. Hartley-Urquhart, Greensill Capital's Vice-Chairman, until his resignation four weeks ago.

47.     From the start of the relationship through February 2021, on average, JCJ III spoke on the phone or in person with Mr. Hartley-Urquhart two or three times per week and regularly exchanged email communications, with the frequency of email communications increasing over time to a daily or near-daily basis through 2020 and into early 2021.

-18-

48.     Throughout all of Plaintiffs' dealings with Greensill Capital, Mr. Hartley-Urquhart represented that he spoke for and had authority to bind Greensill Capital.  Mr. Hartley-Urquhart further represented that he was in constant contact with Mr. Greensill, Greensill Capital's Chairman, and that Mr. Greensill was fully aware of Mr. Hartley-Urquhart's discussions with and agreements with Bluestone.

49.     Furthermore Mr. Greensill participated in conversations with JCJ III and other Bluestone representatives, agreeing with and adopting positions taken by Mr. Hartley-Urquhart.

50.     In the initial 2018 discussions, Greensill Capital and Mr. Hartley-Urquhart, with the support and approval of Mr. Greensill, described to Plaintiffs substantial financing opportunities that included in the first instance receivables financing.

51.     Following the 2018 initial discussions and based on the assurances and representations of Greensill Capital (and Mr. Hartley-Urquhart, in particular), Bluestone and Greensill Capital agreed to enter into (i) a supply-chain financing program by which Greensill Capital offered a facility line of credit to pay down Bluestone accounts payable as an additional source of liquidity and (ii) a receivables purchase program by which Greensill Capital agreed to purchase actual and proposed accounts receivables from Bluestone. Together, the supply-chain financing program and the receivables purchase program constituted the Enterprise Financing.

52.     Plaintiffs and Greensill Capital both agreed and understood from the start that the Enterprise Financing constituted a long-term financing agreement pursuant to which the Plaintiffs and Greensill Capital would partner in the long-term growth and success of the Bluestone business.

***Primary Terms of the CA and RPA***

-19-

53.     On June 14, 2018, Plaintiff Bluestone Resources entered into the CA with Greensill Capital establishing the SCF Program.

54.     The CA is a six-page form agreement and is governed by New York law.

55.     The CA provides for the payment of interest at the "Default Interest Rate" in connection with any failure of Bluestone to make timely payment of amounts due under the CA.

56.     The CA provides both parties the right to terminate the agreement immediately upon notice of a material breach of the CA by the other party.

57.     On September 26, 2018, Bluestone Coal Sales, as Seller, entered into that certain Receivables Purchase Agreement with Greensill Capital, as Buyer, establishing the RPA Program.

58.     The RPA is a 17-page agreement (excluding signature pages, exhibits and schedules) and is governed by New York law.

59.     Pursuant to the terms of the RPA, Greensill Capital agreed to purchase from Bluestone those receivables (the "Proposed Receivables" as defined in the RPA) from time to time identified to Greensill Capital.

60.     Upon purchase by Greensill Capital of such Proposed Receivables, Greensill Capital owned such receivables and the right to collect all amounts due in connection with such receivables if such receivables became actual receivables.

61.     The RPA provides Greensill Capital, as Buyer, the right to terminate the RPA on thirty days' notice, among other termination rights and termination dates.

62.     Both the CA and RPA Program Documentation were repeatedly supplemented and modified over time by multiple oral and written undertakings, including,

without limitation, the following written modifications of the CA and RPA: (i) First Amendment and Joinder to the RPA dated December 7, 2018; (ii) First Amendment to the CA, dated December 7, 2018; (iii) Side Letter to RPA, dated June 10, 2019; (iv) Second Amendment to the CA, dated June 10, 2019; (v) Side Letter to RPA, dated February 6, 2020; (vi) Side Letter to RPA, dated April 10, 2020; (vii) Side Letter to RPA, dated July 31, 2020; (viii) Amendment to Side Letter to RPA, dated September 24, 2020; (ix) Amendment to Side Letter to RPA, dated October 13, 2020; (x) Side Letter to RPA, dated November 3, 2020; (xi) CA Side Letter, dated January 8, 2021; (xii) Amended and Restated Side Letter to RPA, dated January 29, 2021 and (xiii) CA Side Letter, dated January 29, 2021.

63.     Among other actions, these oral and written undertakings effected increases in the "Maximum Outstanding Purchase Price" under the RPA, which is the maximum amount by which the aggregate purchase price paid by Greensill Capital under the RPA could exceed the aggregate amount of collections of purchased receivables received by Greensill Capital.

64.     The Maximum Outstanding Purchase Price under the original RPA was $140 million.

65.     As of the date of this Complaint, the Maximum Outstanding Purchase Price under the RPA as amended is $785 million pursuant to that certain letter agreement dated January 29, 2021.

66.     Among others, the above-mentioned oral and written undertakings effected increases in the size and extensions of the duration of the "Total Facility Limit" under the CA.

-21-

67.     The Total Facility Limit under the original CA was $60 million for the period from the date of the Agreement until the third anniversary thereof, and thereafter subject to the parties' agreement.

68.     As of the date of this Complaint, the Total Facility Limit under the CA as amended was $70 million for the period from date thereof (January 29, 2021) until January 22, 2022, and thereafter subject to the parties' agreement.

69.     As of the date of this Complaint, approximately $780 million has been advanced under the RPA Program and approximately $70 million has been advanced under the SCF Program.

***Implementation of the Financing Programs***

70.     The RPA Program contemplates the purchase by Greensill Capital from Bluestone of "prospective receivables" – receivables that had not yet been generated by Bluestone – from "prospective buyers" – buyers that were not existing customers of Bluestone (the "Prospective Receivables").

71.     This structure is expressly contemplated by the express language of the RPA Program Documentation from its creation in 2018:  the defined term "Receivables" includes so-called "prospective receivables" and the RPA identifies "prospective buyers" as "Account Debtors," which were determined by Defendants providing Bluestone with a list of potential buyers and asking Plaintiffs to identify those buyers Plaintiffs believed could potentially be buyers of Bluestone's met coal in the future.

72.     Defendants also determined in their discretion (i) the amount of each Prospective Receivable purchase and the credit amount of each Account Debtor, (ii) the "maturity date" of each Prospective Receivable (i.e., the date that Bluestone would have to roll

over the obligation to Greensill Capital), and (iii) additional terms relating to each Prospective Receivable purchase under the RPA.

73.     From the start of the RPA Program, as amounts purportedly came "due" under the RPA Program Documentation, Greensill Capital would "roll" amounts owed by Bluestone.

74.     The continuous "rolling" of such amounts was part and parcel of the RPA Program from the beginning as proposed by Defendants and was affirmed throughout the parties' relationship by correspondence.

75.     By way of example, on January 4th, 2019, $15 million of Prospective Receivables were scheduled to "mature".  On that day, Greensill Capital purchased new Prospective Receivables in the amount of $15 million from Bluestone for the discounted price of $14,543,186 (with the "discount" corresponding to the interest to be paid from the date of the "new" purchase until the initial roll-over date).  Bluestone then wired the $14,543,186 received from Greensill Capital as purchase price plus the difference between such amount and the $15 million to be repaid ($456,814 in this instance) back to Greensill Capital.

76.     Greensill Capital understood that most of the Account Debtors were not existing customers of Bluestone.

77.     Over the course of the lifespan of the Financing Programs, Greensill Capital advanced $850 million to Bluestone

78.     Bluestone ultimately only received $723 million in cash from the arrangement.  The $127 million difference between the $850 million in borrowings and the $723 million in cash is attributable to $108 million in fees and $19 million in initial discounts.

-23-

79.     The Fees included a $25 million cancellation fee in connection with the cancellation of the First Warrant Agreement in connection with the entry into the Second Warrant Agreement.

80.     In addition to the $108 million in fees, Greensill Capital received warrants to purchase ownership interest in Bluestone at negligible cost worth at least another $100 million – raising the total value of the fees and warrants received to $208 million

81.     Such fees were a key component of the Enterprise Financing relationship and were memorialized in a total of no fewer than sixteen fee and fee side letters dated between June 14, 2018 and November 30, 2020.

82.     All of the amounts "paid" to Greensill Capital by Bluestone were from funds borrowed by Bluestone from Greensill and from Bluestone operations.

83.     Bluestone paid those fees and provided the warrant compensation in reliance on the parties' mutual understandings that the increases in the Maximum Outstanding Purchase Price and Total Facility Limit were part and parcel of the parties' agreement that Bluestone would not be required to begin to repay principal amounts extended as part of the Enterprise Financing until 2023 at the earliest.

84.     Bluestone also paid approximately $89 million in interest to Greensill Capital (including the approximately $19 million in initial discounts).

85.     Defendant Mr. Hartley-Urquhart induced Plaintiffs' entry into the CA and RPA, and payment of the fees and other value through, among other things, representations with respect to Defendants' commitment to a long-term relationship with Plaintiffs, and agreement that amounts owed under the Financing Programs would not begin to be repaid until 2023.

*Introduction to GFG Alliance*

86.     In January 2020, Defendants introduced Plaintiffs to GFG Alliance.

87.     GFG is a collection of global businesses and investments, owned by Sanjeev Gupta and his family.

88.     The GFG Alliance is structured into three core businesses: aluminum, energy, and—most relevant to the relationship with Bluestone—steel.

89.     At the time, Bluestone understood that GFG was also a client of Greensill Capital's but had no knowledge as to the extent or pervasive nature of the relationship between GFG and Defendants.

90.     After Defendants introduced Plaintiffs to GFG, Plaintiffs were emphatically encouraged by the Defendants into a customer relationship with GFG, delivering met coal to the Defendants' recommended business partner.

91.     Bluestone sold their first delivery of met coal to GFG in June 2020 for which GFG was granted an extended payment period, to December 2020, for which GFG still was late in payment.

92.     Bluestone sold a second round of cargo in December 2020, to ship in January 2021—Bluestone ultimately withheld the shipment due to concerns regarding the credit risk of GFG.

93.     Following GFG's failure to make payment to Bluestone when due in December 2020, Defendant Mr. Hartley-Urquhart vouched for GFG and urged Plaintiffs to continue to do business with GFG despite the late-payment, but later agreed that if he were in Bluestone's shoes he would not ship to GFG.

-25-

*Implementation of "Cashless Rolls" During the COVID Pandemic*

94.     On or about July 30, 2020, Greensill Capital unilaterally offered to modify the parties' course of dealing, with Mr. Hartley-Urquhart informing Bluestone that it would no longer be asked to "roll" the entire amount "due" to Greensill Capital, but rather only send the net payment, attributable to the interest owed, to Greensill Capital.

95.     Greensill Capital described this process as a "cashless roll," which made clear that any obligations to repay amounts advanced under the SCF and RPA Programs were long-term financing, confirmed the long-term nature of the Enterprise Financing. "Cashless rolls" became the accepted means of paying interest through the duration of the Enterprise Financing relationship.

96.     In line with that understanding, Defendants repeatedly acknowledged that Bluestone would not be required to begin to repay amounts extended as part of the Enterprise Financing under the SCF and RPA Program Documentation until 2023 at the earliest.

97.      Defendants understood clearly that the Bluestone business was not expected to generate sufficient cash flow in the near term to pay down any amounts advanced under the SCF and RPA Programs.

98.     As a result, the parties agreed that amounts owed to Greensill Capital under the SCF and RPA Programs would remain outstanding until such time that the business could generate sufficient cash flow to begin to amortize the debt.

99.     That understanding was affirmed consistently by Defendants, including through the first 8 months of the COVID pandemic (March to November 2020), during which time Bluestone, like many companies, required additional liquidity and sought assistance from their financing partners.

100.     Prior to the COVID pandemic, Defendants committed to a 4-5 year financing period, but in March 2020 as the pandemic hit, Defendants further extended that financing commitment to a 6-8 year period and induced Plaintiffs to continue to expand their exposure to Greensill Capital.  As confirmation of that agreement, Defendants also offered to increase availability of funds to Bluestone in exchange for additional fees.

101.     Defendants agreed, including through frequent phone calls between JCJ III and Mr. Hartley-Urquhart, as well as an in-person meeting in September 2020 at Mr. Hartley-Urquhart's Westhampton, New York home, to extend additional funding in a manner consistent with the parties' dealings to date (i.e., "cashless rolls" of amortization payments and additional advances to cover interest costs).

102.     At the September 2020 meeting, Mr. Hartley-Urquhart and JCJ III discussed converting a portion of Bluestone's debt to equity and Greensill Capital providing additional funding to Bluestone through extension of additional debt.

103.     At no point at that meeting did Mr. Hartley-Urquhart suggest that Bluestone would be asked to repay any outstanding amounts under the SCF or RPA Programs prior to 2023.

104.     That understanding was also reaffirmed in discussions throughout the remainder of 2020 with respect to potential plans for Greensill Capital to convert some or all of its claims against Bluestone into Bluestone equity as well.

***Defendants' Demand for Security Agreement, Additional Fees and Repayment of All Outstanding Amounts by July 2021***

105.     In or around November 2020, without explanation, Defendants abandoned the course of conduct that they had established with Plaintiffs since the commencement of the Financing Programs and began demandingadditional fees, demanding new security interests to

secure the repayment of already existing borrowings, and demanding accelerated repayment of amounts outstanding.

106.    Plaintiffs made clear to Defendants repeatedly that such an accelerated repayment timetable was inconsistent with the understandings and agreements between the parties prior thereto and that Plaintiffs were not capable of repaying the amount outstanding under the Program Documentation, which amounted to approximately $850 million as of that time, on the newly proposed timetable.

107.    Attempts to obtain clarification from Greensill Capital on these changes were met with obstruction and obfuscation from Mr. Hartley-Urquhart.

108.    At or around the same time, Defendants required Bluestone to enter into the Guarantee and Security Agreement, more than two years after the Financing Programs had begun.

109.    Greensill Capital provided no new consideration for the granting of such security interests.

110.    Under that agreement, Bluestone pledged various assets as collateral for their obligations owed to Greensill Capital.

111.    At the end of November 2020, Defendants required Bluestone to pay a new $15 million fee, purportedly in compensation for prior unspecified consideration, while at the same time telling Bluestone that such fee income was important to Greensill Capital's efforts to launch its own initial public offering.

112.    Plaintiffs have come to learn that earlier in 2020, Greensill Capital had begun to experience severe financial issues in connection with its insurance underwriter, was having trouble finding a new auditor, had realized that there was no chance for the launch of an

IPO, was fielding questions from its financiers at the Credit Suisse group and had even begun consideration of a possible bankruptcy and that German banking regulators were completing a forensic audit of Greensill Capital's German bank subsidiary that has now resulted in an investigation of criminal fraud.  Plaintiffs were not aware of such issues until public reports in March 2021.

113.    Over the course of January and February 2021, Defendants, including Defendant Mr. Hartley-Urquhart personally, continued to pressure Plaintiffs with respect to the repayment of debt in 2021, engaging in increasingly frantic conduct.  Examples of such behavior include: (i) urging Bluestone to look for a potential equity investor through an investor roadshow, and then promptly urging Bluestone to instead refinance its debt; and (ii) repeated insistence of repayment on an expedited timeline as early as July 2021 despite prior agreements that amounts would continue to roll until at the earliest 2023.

114.    In addition, in or around November 2020, Mr. Hartley-Urquhart insisted that the parties begin discussions with respect to a potential conversion of outstanding debt obligations into equity.

115.    Thereafter, a representative of Greensill Capital, Mr. Randolph "Dolph" Habeck, met with Plaintiffs on December 1, 2020 in White Sulphur Springs, West Virginia.  Mr. Hartley-Urquhart had told Plaintiffs, prior to the meeting, that Mr. Habeck was in charge of "distribution"; however, upon meeting Mr. Habeck, Plaintiffs came to understand that he specialized in high-yield bond offerings.  Rather than engage in discussions around a debt-to-equity exchange as Plaintiffs expected, Mr. Habeck reiterated Defendants' prior demand for repayment of all obligations under the RPA by July 2021 and urged the Plaintiffs to support a high yield debt offering that would repay Greensill Capital in full.

-29-

116.     Through subsequent conversations between Mr. Hartley-Urquhart and JCJ III, Plaintiffs came to understand that Defendants' identification of July 2021 as a repayment date was arbitrary.  It was not supported by any agreement or other documentation between the parties.

117.     On approximately February 10, 2021, Mr. Hartley-Urquhart and his representative followed up with Plaintiffs to engage in discussions with respect of a repayment, including urging Plaintiffs to retain a financial advisor.

118.     When JCJ III identified an investment banking firm as a potential advisor, Mr. Hartley-Urquhart asked if he could reach out to the potential advisor directly, which request JCJ III clearly declined.  Nevertheless, Mr. Hartley-Urquhart proceeded to contact the firm and other investment banks in connection with Bluestone.

119.     Mr. Hartley-Urquhart then urged Plaintiffs to select a financial advisor of his choosing and expressed displeasure when Plaintiffs engaged an advisor of their own choosing, who had no connections to Mr. Hartley-Urquhart.

***Defendants Increase Pressure on Plaintiffs Amidst Greensill Capital's Collapse***

120.     In response to continued outreach from Defendants in connection with refinancing discussions, on January 27, 2021, Bluestone sent Defendants a letter reiterating that Defendants had always agreed that any repayment of obligations under the Program Documentation would be delayed to allow the business to grow, that Bluestone would not be able to pay off outstanding obligations on the July 2021 timeline demanded by Defendants, and that the parties should engage in discussions about a debt to equity exchange, consistent with prior discussions and understandings.

-30-

121.    Mr. Hartley-Urquhart responded to that letter by telephone on or around January 27, 2021 insisting that Bluestone make full repayment by July 2021 without rebutting JCJ III's statements about Mr. Hartley-Urquhart's prior agreements on the timing of repayment.

122.    On February 5, 2021, Bluestone sent another letter to Defendants Greensill Capital and Mr. Hartley-Urquhart, reminding them of the parties' prior agreements and urging discussions proceed consistent with those agreements.  Plaintiffs did not receive a response to that letter until March 6, 2021, which letter was signed only by "Greensill" and was sent after the departure of Mr. Hartley-Urquhart from Greensill Capital.

123.    Thereafter, on or around February 9, 2021, Mr. Hartley-Urquhart and JCJ III spoke by telephone, and Mr. Hartley-Urquhart informed JCJ III that Defendants had failed to make a payment to Credit Suisse and that a payment from Bluestone was needed in order for Defendants to pay "Credit Suisse."  While Bluestone had made each of its payments on time, and particularly made a payment to Greensill days prior, Defendant Mr. Hartley-Urquhart asked Bluestone to wire money to cover Greensill's missed payment directly to Credit Suisse, so that Greensill could blame Bluestone for its own late payment.

124.    That telephone call was the first time that Plaintiffs became aware of any involvement of Credit Suisse with Defendants or with the Financing Programs.

125.    Later that night, Mr. Hartley-Urquhart emailed JCJ III to say that he found a solution to Defendants' Credit Suisse issue.  At the time and as of the date of this Complaint, Plaintiffs are unaware what that "solution" was.

126.    On February 20, 2021, Mr. Hartley-Urquhart met with JCJ III and JCJ II in White Sulphur Springs, West Virginia, and demanded Bluestone pay $300 million by the end

of the third quarter 2021, noting that there could be an opportunity to extend this repayment date by one or two more quarters, but not more.

127.     Thereafter, on February 26, 2021Mr. Hartley-Urquhart approached Bluestone to demand repayment by Bluestone of $850 million by the end of third quarter 2021.

128.     On March 1, 2021, JCJ III received a telephone call from Mr. Hartley-Urquhart, which he returned with Bluestone's financial advisor also on the call.

129.     On the return call, Mr. Hartley-Urquhart informed Bluestone both that Greensill Capital had collapsed and that Mr. Hartley-Urquhart would be leaving the company.

130.     At this time, Mr. Hartley-Urquhart also informed Plaintiffs that Greensill Capital would not be providing the $5 million to Bluestone that was due to be delivered to Bluestone by the end of February 2021 (the "February 2021 Advance") as required by the Program Documentation.

131.     Plaintiffs learned thereafter that Mr. Hartley-Urquhart had resigned as a Director of Greensill Capital three weeks earlier and had left the company sometime prior to that telephone call, but had represented on the telephone call that he still spoke for Greensill Capital.

132.     At no point prior to reading press reports in early 2021 did Plaintiffs have any understanding about how Greensill Capital financed its own business or that Greensill Capital packaged obligations from its own borrowers and somehow transferred certain of those obligations to third parties.

133.     Prior to such press reports, Plaintiffs were also unaware of any involvement of Greensill Capital's affiliated German bank in the financing of Greensill Capital or of any aspect of the Enterprise Financing.  While Plaintiffs were aware of the bank's existence, Plaintiffs had no knowledge as to the German bank's role in Defendants' business.

134.    As of the date of this Complaint, Plaintiffs have received no documentation from Greensill Capital indicating whether and to what extent any part of the Enterprise Financing or obligations thereunder have been transferred from Greensill Capital to any other entity.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract under New York law Against Greensill Capital)

135.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

136.    The Enterprise Financing, including the SCF Program Documentation and RPA Program Documentation constitute a valid and enforceable contract.

137.    The Enterprise Financing, SCF Program Documentation and RPA Program Documentation were modified by, among others, oral representations made by Mr. Hartley-Urquhart and agreements between Mr. Hartley-Urquhart and Plaintiffs.  New York law recognizes two exceptions to the enforcement of a contractual proscription against oral modification:  first, under the principle of equitable estoppel if "a party to a written agreement has induced another's significant and substantial reliance upon an oral modification," and second, where there has been partial performance of the oral modification to be enforced.  *Aircraft Services Resales LLC v. Oceanic Capital Co. Ltd., 586 Fed.Appx. 761 (2014)*.  Defendant Greensill Capital is equitably estopped from invoking a bar on oral modification under the doctrine of equitable estoppel because Defendant Greensill Capital induced Plaintiffs' significant and substantial reliance on the oral representations and agreements exchanged between the parties with respect to, among other things, a repayment date.  In addition, Defendant Greensill Capital partially performed under the oral modifications with respect to, among other things, the repayment date, including by entering into the numerous amendments to the SCF Program

-33-

Documentation to increase the Total Facility Limit and to the RPA Program Documentation to increase the Maximum Outstanding Purchase Price as part and parcel of the parties' agreement that Bluestonewould not be required to begin to repay amounts extended as part of the Enterprise Financing until 2023 at the earliest.

138.    The Plaintiffs performed all of their obligations under the Enterprise Financing and Program Documentation, as amended and supplemented by both written and oral agreements between the parties.

139.    As set forth above, the Defendant Greensill Capital breached its obligations under Enterprise Financing and the Program Documentation by failing to fund the February 2021 Advance.

140.    Defendant Greensill Capital also breached its obligations under the Enterprise Financing and Program Documentation by demanding repayment of the amounts owed by Bluestone under such documentation on an arbitrary, expedited timeframe in furtherance of its scheme to defraud Plaintiffs.

141.    Defendant Greensill Capital's breach of the Program Documentation has caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business. Defendant Greensill Capital's actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

142.     Defendant Greensill Capital is therefore liable for damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing under New York law Against Greensill Capital)**

143.     Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

144.     The Enterprise Financing and Program Documentation includes an implied covenant of good faith and fair dealing between Defendant Greensill Capital and Plaintiffs, implied into every contract under New York state law.

145.     The implied covenant of good faith and fair dealing required that Defendants not do anything that would destroy or injure the right of the Plaintiffs to receive the benefits of its bargain with Defendant Greensill Capital.

146.     Defendant Greensill Capital deprived Plaintiffs of the benefit of its bargain with Defendant Greensill Capital and breached the implied covenant of good faith and fair dealing when Defendant Greensill Capital, among other things, (i) made material misrepresentations to Plaintiffs with respect to Defendant Greensill Capital's financial condition, (ii) failed to fund the February 2021 Advance, and (iii) engaged in a fraudulent scheme to pressure Plaintiffs to alter their long-standing commercial relationship as Defendant Greensill Capital's financial condition deteriorated by (x) demanding the accelerated repayment of amounts outstanding under the Program Documentation, (y) pressuring Bluestone to pay additional fees to Defendant Greensill Capital for prior actions in the lead-up to Defendant Greensill Capital's financial collapse, and (z) requiring Bluestone to pledge additional security for the obligations under the Financing Programs on the eve of Defendant Greensill Capital's financial collapse.

147.     Defendant Greensill Capital's breach of the Enterprise Financing and Program Documentation has caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business. Defendant Greensill Capital's actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

148.     Defendant Greensill Capital is therefore liable for damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
**(Common Law Fraud under West Virginia state law against Greensill Capital and Mr. Hartley-Urquhart)**

149.     Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

150.     Defendants Greensill Capital and Mr. Hartley-Urquhart made material misrepresentations to Plaintiffs in connection with a repayment date under the Enterprise Financing and Program Documentation over the course of the lifespan of the Financing Programs to induce Bluestone to pay Greensill Capital excessive fees in connection with amendments to the RPA and CA Program Documentation.

151.     Defendants Greensill Capital and Mr. Hartley-Urquhart also made false and misleading representations, and failed to disclose material facts, to Plaintiffs with respect to

-36-

Defendant Greensill Capital's financial condition and deterioration, including in the lead-up to the commencement of Greensill Capital's insolvency proceedings in the United Kingdom and Australia and the seizure of Greensill Capital's German bank by German regulators.

152.   Defendants Greensill Capital and Mr. Hartley-Urquhart knew that Greensill Capital's financial condition was deteriorating in the months leading up to the commencement of the insolvency proceedings and failed to alert Plaintiffs to the severity of the situation.

153.   Defendants Greensill Capital and Mr. Hartley-Urquhart consistently assured Plaintiffs of the Defendant Greensill Capital's financial health, hiding the true facts of Greensill Capital's rapidly deteriorating condition in an effort to extract additional value from Plaintiffs.

154.   Plaintiffs relied on such representations in continuing the relationship with Defendants rather than finding alternative sources of financing.  This reliance was reasonable given the relationship of trust the Defendants had cultivated with the Plaintiffs.

155.   By obscuring Greensill Capital's financial condition, Defendants Greensill Capital and Mr. Hartley-Urquhart fraudulently induced Bluestone to pay fees, grant security interests and issue warrants to Greensill Capital and not seek replacement sources of financings all in reliance on Defendants' assurances that it was a reliable, stable, long-term source of financing.

156.   Defendants' misrepresentations and omissions, including without limit those by Mr. Hartley-Urquhart, constitute fraud and have caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Bluestone's

most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow. Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business. Defendants' actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

157.    Defendants Greensill Capital and Mr. Hartley-Urquhart are therefore liable for damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Breach of Duty of Care under West Virginia state law Against Greensill Capital)**

158.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

159.    West Virginia state law recognizes a claim for breach of duty of care when the parties have a "special relationship" which imparts such a duty of care. That "special relationship" has been recognized in the context of lender-borrower relationships when the relationship extends beyond the traditional role of a lender to a borrower.

160.    Defendant Greensill Capital's conduct created a special relationship with Bluestone. Beyond just simply financing loans to the Plaintiffs, Defendant Greensill Capital operated as partner to Bluestone, involved in operational decisions and attempting to exercise control over elements of Bluestone's business. Examples of such behavior include, but are not limited to, pressuring Bluestone into relationships with both GFG, as customer, and Morgan Stanley or Rothschild, as advisor.

161.    Defendant Greensill Capital breached the duty of care owed to Plaintiffs when it (i) made material misrepresentations to Plaintiffs with respect to Defendant Greensill

-38-

Capital's financial condition, (ii) failed to fund the February 2021 Advance, and (iii) engaged in

a fraudulent scheme to pressure Plaintiffs to alter their long-standing commercial relationship as

Defendant Greensill Capital's financial condition deteriorated by (x) demanding the accelerated

repayment of amounts outstanding under the Program Documentation, (y) pressuring Bluestone

to pay additional fees for prior actions in the lead-up to Defendant Greensill Capital's financial

collapse, and (z) requiring the pledge of additional security for the obligations under the

Financing Programs on the eve of Defendant Greensill Capital's financial collapse.

162.    Defendant Greensill Capital's breach of its duty of care under West

Virginia state law to Plaintiffs has caused significant damage to Plaintiff Bluestone, including

but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The

reputational damage has already been serious as many of Plaintiff Bluestone's most important

counterparties, including but not limited to vendors, suppliers, customers, and bonding

companies reached out immediately to express serious concern regarding the impact Greensill

Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact

from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business.

Defendant Greensill Capital's actions have also harmed the individual Plaintiffs JCJ III, JCJ II

and Cathy Justice.

163.    Defendant Greensill Capital is therefore liable for damages in an amount

to be determined at trial.

### **FIFTH CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Duty of Care under West Virginia state law against Mr. Hartley-Urquhart and Mr. Greensill)**

164.    Plaintiffs restate and incorporate the allegations of the preceding

paragraphs as if set forth fully herein.

165.     Defendants Mr. Hartley-Urquhart and Mr. Greensill aided and abetted the breach of the duty of care by Defendant Greensill Capital by knowingly participating in the breaches of duty.

166.     Defendant Mr. Hartley-Urquhart's and Defendant Mr. Greensill's breach of duty of care under West Virginia state law to Plaintiff Bluestone has caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business.  Defendants' actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

167.     Defendant Mr. Harley-Urquhart and Defendant Mr. Greensill are therefore liable for damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty under Delaware state law against Greensill Capital)

168.     Defendant Greensill Capital had a fiduciary duty to Plaintiffs under Delaware state law as result of the relationship of trust and confidence it created and maintained with Plaintiffs, including by conducting itself as a partner to Plaintiffs, involving itself in operational decisions and attempting to exercise control over elements of Plaintiffs' business. Examples of such behavior include, but are not limited to, pressuring Bluestone into a relationships with both GFG, as customer, and Morgan Stanley or Rothschild, as advisor.

-40-

169.     Defendant Greensill Capital willfully and intentionally breached the duty of utmost faith and undivided loyalty owed to the Plaintiffs under Delaware fiduciary duty law, when Defendant Greensill Capital, among other actions, (i) made material misrepresentations to Plaintiffs with respect to Defendant Greensill Capital's financial condition, (ii) failed to fund the February 2021 Advance, and (iii) engaged in a fraudulent scheme to pressure Plaintiffs to alter their long-standing commercial relationship as Defendant Greensill Capital's financial condition deteriorated by (x) demanding the accelerated repayment of amounts outstanding under the Program Documentation, (y) pressuring Bluestone to pay additional fees to Defendant Greensill Capital for prior actions in the lead-up to Defendant Greensill Capital's financial collapse, and (z) requiring the pledge of additional security for the obligations under the Financing Programs on the eve of Defendant Greensill Capital's financial collapse.

170.     Defendant Greensill Capital's breach of its fiduciary duties under Delaware state law to Plaintiff Bluestone has caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business.  Defendant Greensill Capital's actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

171.     Defendant Greensill Capital is therefore liable for damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
**(Aiding and Abetting Breach of Fiduciary Duty under Delaware state law against Mr. Hartley-Urquhart and Mr. Greensill)**

172.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

173.    Defendants Mr. Hartley-Urquhart and Mr. Greensill aided and abetted the breach of duties by Greensill Capital by knowingly participating in the breaches of duty.

174.    Greensill Capital's breach of its fiduciary duties under Delaware state law to Plaintiff Bluestone has caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business. Defendant Greensill Capital's actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

175.    Defendants Mr. Hartley-Urquhart and Mr. Greensill are therefore liable for damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
**(Unjust Enrichment under West Virginia law against Greensill Capital)**

176.    Defendant Greensill Capital was enriched as a result of its breach of the Enterprise Financing and Program Documentation, its breach of its implied covenant of good faith and fair dealing and its fraudulent scheme.

177.    The enrichment was at the expense of the Plaintiffs including, without limitation, through the receipt of approximately $108 million of fees and of a warrant to purchase a 10% ownership interest in Bluestone Resources from Plaintiffs that Greensill Capital itself valued at $100 million.

178.    By reason of the foregoing, in accordance with West Virginia common law, Defendant Greensill Capital has caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business. Defendant Greensill Capital's actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

179.    Defendant Greensill Capital is therefore liable for damages in an amount to be determined at trial.

### <u>NINTH CLAIM FOR RELIEF</u>
**(Civil Conspiracy under West Virginia state law against All Defendants)**

180.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

181.    Under West Virginia law, a civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. *Kessel v. Leavitt*, 204 W.Va. 95, 128, 511 S.E.2d 720, 753 (1998).

182.     At all relevant times, Defendants agreed to and did conspire to willfully and maliciously injure Plaintiffs in its reputation, trade, business or profession through the fraud committed by Defendants Greensill Capital, Mr. Greensill and Mr. Hartley-Urquhart as described above.

183.     By reason of the foregoing, in accordance with West Virginia common law, Defendants have caused significant damage to Plaintiff Bluestone, including but not limited to, attorneys' fees and litigation expenses, as well as reputational damage.  The reputational damage has already been serious as many of Plaintiff Bluestone's most important counterparties, including but not limited to vendors, suppliers, customers, and bonding companies reached out immediately to express serious concern regarding the impact Greensill Capital's demise will have on Bluestone's liquidity and cash flow.  Such trickle-down impact from the implosion of Greensill will have long-standing effects on Plaintiff Bluestone's business.  Defendants' actions have also harmed the individual Plaintiffs JCJ III, JCJ II and Cathy Justice.

184.     Defendants are therefore liable for damages in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Punitive Damages Against All Defendants)

185.     By reason of the foregoing willful and unconscionable acts causing severe monetary loss to Plaintiffs, and as a matter of public policy to punish Defendants for such conduct, Plaintiffs seek punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that the Court enter judgment against Defendants and in favor of Plaintiffs for the following relief:

-44-

a)  Direct and consequential damages;

b)  Punitive damages as allowed by law;

c)  Costs, interest, expenses, and attorneys' fees;

d)  Pre-judgment and post-judgment interest on the Plaintiffs' damages as allowed

by law;

e)  Such other and further relief as the Court deems just and proper.


Dated:   March 15, 2021                          Respectfully submitted,
New York, New York

                                                 */s/ James L. Bromley*
                                                 James L. Bromley
                                                 Benjamin S. Beller
                                                 SULLIVAN & CROMWELL LLP
                                                 125 Broad Street
                                                 New York, New York  10004
                                                 Telephone:     (212) 558-4000
                                                 Facsimile:     (212) 558-3588
                                                 Email:         bromleyj@sullcrom.com
                                                                belllerb@sullcrom.com


                                                 *Counsel to the Plaintiffs*


-45-